UNITED CONSTRUCTION COMPANY v. CITY OF ST. LOUIS, Appellant.— 69 S. W. (2d) 639.

Division One, March 14, 1934.

*Charles M. Hay* and *Oliver Senti* for appellant.

1008

*Case, Voyles & Stemmler* and *Earl M. Pirkey* for respondent.

STURGIS, C.—The plaintiff construction company seeks to recover by the first count of its petition a balance, over what has been paid it, for constructing a tunnel sewer under contract with the defendant city. The defendant let the contract for constructing this sewer of 6000 feet in length to plaintiff as the lowest bidder under plans and specifications prepared by the city. The sewer in question is designated as Section A, Ohio-Montrose Public Relief Sewer, and is part of a larger system of sewers, the construction of which was authorized by a duly passed ordinance of defendant city. This Section A of the sewer system, the construction of which was contracted between plaintiff and defendant, consisted in small part of what is designated as open cut work, but was very largely a tunnel with a varying depth under the surface of a few feet up to 60 or 70 feet. When completed the sewer was a horseshoe shaped tunnel with the arch at the top and lined with concrete to a thickness of from 6 to 12 inches. The completed sewer tunnel commenced at the south end with an inside diameter of 5 feet and continuing at that size for about 2000 feet and then changed to 7 feet in diameter for the balance of the distance—that is, there was approximately 2000 feet of 5-foot sewer tunnel and 4000 feet of 7-foot sewer tunnel constructed by plaintiff under contract with defendant. The work undertaken by plaintiff was to excavate or drive the tunnel and line it with concrete or cement in order to prevent its caving in and becoming obstructed. It is apparent that the two principal factors determining the cost of construction are the size of the tunnel as measuring the amount of excavation and the thickness of the concrete lining as measuring the necessary amount of concrete work. It was necessary that the size of the excavated tunnel be sufficient to include the thickness of the concrete lining when that was determined and that the thickness of the concrete lining be such as to support the roof of the

tunnel *and to completely fill the excavated space.* The thickness and character of the tunnel roof to be supported became and is the controverted factor in this branch of the case. The contract embodying the plans and specifications provided that the concrete lining of the sewer at the bottom and on the sides up to the spring of the arch, that is, to where it began to round off, should have a minimum thickness of 6 inches and the arch above this medium line should have a thickness dependent on the character and thickness of the rock (limestone) above and overlying the tunnel sewer. The contract specified three thicknesses of the concrete lining over the arch designated by letters A, B and C. Type C was to be 6 inches thick, making a uniform concrete lining of 6 inches thick in this type and was to be used wherever there was 10 feet or more of solid rock above the spring line of the sewer arch. This was the thinest type of sewer lining required because of the thickness of the overlying rock and required the least amount both of excavating and concrete. It was the cheapest to the city. The A type of concrete lining required a uniform thickness of 12 inches of concrete above the spring of the arch and was to be used whenever there was 5 feet or less of solid rock formation above the spring line of the arch. This was the thickest type of sewer lining required and the most expensive to the city. The B or middle type of concrete lining was to be used where the overlying rock was between 5 and 10 feet thick and was from 6 to 12 inches in thickness and this cost more than the C type and less than the A type.

The contract was on what is termed a unit basis—so much for each lineal foot complete as fixed by the contractor's bid based on the size of the tunnel and the type or thickness of the concrete lining, allowances being made by the contract for certain extras and changes in the construction. Thus there was known to be approximately 6000 feet of tunnel sewer, 4000 feet of 7-foot diameter and 2000 feet of 5-foot diameter, and in estimating the cost and in bidding on the job there were two diameter dimensions and three types of concrete lining for each, so that 7A sewer meant 7 feet in diameter and the type of lining designated as A type, 12 inches of concrete above the arch, and 5C or 7C meant a sewer of that diameter with 6 inches of concrete lining all around. As the contractor fixed his own price on each unit of sewer, it was supposed to make no difference to him which type the city demanded or used at the price bid. The city would naturally demand and use the C type as being the cheaper unless the contract required it to use the higher A or B type for the work it wanted.

The contract was let on the plans and specifications prepared by the defendant city and its engineer and on an estimate based thereon. The contract price could not exceed the total of this estimate and bidders took notice of this. The city engineer's estimate of the cost

was approximately $305,000. The plaintiff's bid was $301,800.72 based on this estimate. Other bids were between these amounts.

There is no difference between the parties as to the open cut work but only as to the tunnel work. Nor is there any difference as to the lineal feet of sewer, either that of 7 feet in diameter or 5 feet in diameter. Nor is there any difference as to the amount of 5A type of sewer. The difference grows out of plaintiff's claim that 2865.8 lineal feet of tunnel sewer was constructed by defendant and paid for as C type, having a supporting overhead of 10 feet or more of solid rock, when it was in fact and should have been classed and paid for as B type of sewer. The contract price based on plaintiff's bid is as follows:

| | |
|---|---|
| For Type 7A tunnel per lineal foot | $73.60 |
| For Type 7B tunnel per lineal foot | 64.00 |
| For Type 7C tunnel per lineal foot | 45.00 |
| For Type 5A tunnel per lineal foot | 34.95 |
| For Type 5B tunnel for lineal foot | 33.85 |
| For Type 5C tunnel per lineal foot | 26.45 |

The estimate of the city engineer which became the basis of the bidders for doing this work specified the estimated amounts of work as follows:

| | |
|---|---|
| Type 7A complete | 200 lineal feet |
| Type 7B complete | 200 lineal feet |
| Type 7C complete | 3,677 lineal feet |
| Total of 7-foot tunnel | 4,077 lineal feet |
| Type 5A complete | 100 lineal feet |
| Type 5B complete | 100 lineal feet |
| Type 5C complete | 1,743 lineal feet |
| Total of 5-foot tunnel | 1,943 lineal feet |

When the work was completed no objection was made to the quality of the work and it was accepted by the city as being in compliance with the contract. The city engineer, as the contract provides, made what is termed the final estimate of the work done under the contract, which, among other items not questioned, contained the following amounts:

| | | | |
|---|---|---|---|
| Type 7A Tunnel Complete | 766.00 lin. ft. @ $73.60 | $ 56.377.60 |
| Type 7B Tunnel Complete | 325.00 lin. ft. | 64.00 | 20,800.00 |
| Type 7C Tunnel Complete | 2,939.80 lin. ft. | 45.00 | 132,291.00 |
| Type 5A Tunnel Complete | no lin. ft. | | |
| Type 5B Tunnel Complete | no lin. ft. | | |
| Type 5C Tunnel Complete | 1,994.67 lin. ft. | 26.45 | 52,759.02 |
| | Total cost of tunnel | | $262,227.62 |

It will thus be seen that on the final measurements and classifications, whereas the original estimate on which plaintiff bid gave only 200 lineal feet of 7-foot Type A tunnel sewer, plaintiff was allowed and paid for 766 lineal feet. This, as we have said, was the highest price sewer as under the specifications it required a larger amount of excavation and concrete lining. Also there was a larger amount of 7 B sewer than was estimated and a corresponding less amount of Type C sewer (the cheapest type) than was estimated. These changes were in plaintiff's favor and largely account for the fact that plaintiff was actually allowed and paid a substantial amount, about $20,000, more than its bid. Plaintiff insists, however, that this work actually cost it near $75,000 more than it was actually paid therefor. To be more specific, the plaintiff by the first count of its petition claims that it actually constructed 2865.8 lineal feet of 7-foot sewer Type B, or the equivalent thereof, for which it should have been paid at the contract price of $64 per lineal foot, and was actually paid only $45 per lineal foot, the price of C type of 7-foot sewer, and that it constructed 1994.67 lineal feet of 5-foot Type B tunnel sewer, or its equivalent, for which it should have been paid at the contract price of $33.85 per lineal foot, and was paid only at the rate of $26.45 per lineal foot, the price of C type of 5-foot sewer. Plaintiff sues in the first count for the difference of $69,-210.75 as being yet due and unpaid.

There was a jury trial resulting in a verdict for defendant. The court granted plaintiff a new trial on its motion, specifying that the court had given erroneous instructions to the jury on defendant's behalf and that the verdict was against the weight of the evidence. The defendant has appealed from this order granting plaintiff a new trial. Disregarding the grounds specified by the court for granting a new trial, the defendant as appellant presents the case here on the proposition that there is no evidence on which a verdict for plaintiff can be upheld and that under the pleadings and evidence the court should have directed a verdict for defendant. If this be correct, then a new trial should not have been granted, regardless of any error in defendant's instructions, and there was no evidence for plaintiff to be weighed. We discuss the case from this standpoint.

The petition is long and complicated. The plaintiff asserts a right to recover on a sort of *quantum meruit,* the *"quantum"* being measured by the amount of sewer tunnel excavated and the amount of concrete used, gaged by the thickness of the lining actually put in, and the *"meruit"* being measured by the price bid by it for the various types of sewer. This, we think, is an erroneous measure of plaintiff's right to recover under the contract. It loses sight of the fact that the city was only interested in the result and that plaintiff, as contractor, assumed the risk of being compelled, on account of

the character of rock encountered, to excavate and refill with concrete a larger amount of space than was necessary for the dimensions of the sewer, and in so doing to use a thicker lining of concrete and consequently more concrete than was necessary in constructing the type of sewer called for in order to fill up the space made vacant by the excess excavation. This is what happened: In excavating the sewer tunnel plaintiff encountered stratified limestone and a cave of varying size with running water therein and extending in a general parallel direction with the tunnel. The tunnel did not coincide with this cave but was at a lower level and followed its course at varying distances from it. The tunnel was in stratified limestone rock with bedding seams between the layers or ledges of rock of varying thickness. The rock formation was in layers or ledges with bedding seams of varying thickness between the layers of rock. Considering the great thickness or depth of rock above the medium line of the sewer, for most of its length at least, there was no danger of the sewer caving in and a 6-inch concrete lining was all that was necessary to hold up and keep in place the sewer arch; but on account of the rock being in layers or strata it was found to be impossible, or at least impractical, to excavate a straight edge at the sides or semicircular arch over the tunnel. In blasting the rock it would break or shatter along horizontal lines, leaving the surface uneven and not following the outside or near line of the horseshoe tunnel and leaving the excavated space larger than necessary or desirable. For example, the 7-foot C type of tunnel only required the excavation to be the same shape and size of the inside sewer tunnel plus 6 inches all around to be filled with concrete as and for the sewer lining and would require only enough concrete to fill this 6-inch lining space. In attempting to excavate a tunnel of this size and shape through the stratified limestone it was found that the rock layers would not break in circular form nor even on perpendicular lines, so that when the loose rock was removed the tunnel excavation was with irregular surface and with excavated space beyond the neat or necessary lines. The tunnel had to be excavated large enough at all points to include the 7-foot tunnel sewer and the surrounding lining, so that the excess excavation caused by the irregular breaking of the rock strata had to be replaced with concrete. The evidence shows also that the rock formation through which the tunnel was driven was what is termed shaley rock, disintegrating, scaling off and falling to the bottom of the tunnel after being exposed to the air, thus enlarging the space to be replaced with concrete. Plaintiff says it was ordered by defendant to remove all this extra loose rock, but, whether ordered to or not, plaintiff had to do so in order to complete the tunnel sewer which its contract required it to do. Plaintiff's evidence tends to show that had the rock formation through which the tunnel was driven been solid rock without layers with bedding seams between the

same, the tunnel could have been driven through same with a near smooth surface and conforming to the size and shape of the required sewer and lining and with little excess in the amount excavated and little extra concrete to replace the same. ■ The question presented is whether, under the contract in question, the city should pay the contractor for the excessive excavation and concrete to replace same, or was that covered by and included in the price bid for constructing the sewer tunnel complete. The plaintiff takes the position that the contract was made on the basis of the city's representation, if not guarantee, that the sewer was to be constructed through solid rock. We do not so read and construe the contract. It contains this clause:

"The borings indicate that all the tunnel will be in solid limestone. Cores from all diamond drill holes sunk are on exhibition at the City Hall in St. Louis, and should be examined and interpreted by prospective bidders. The classification of materials shown on the plans, while believed to be substantially correct, shall not form the basis of any claims by the contractor in case the materials encountered prove to be different from the interpretation given on the plans."

Instead of guaranteeing that the tunnel will be in solid limestone, the contract merely says that the borings made at intervals from the surface to the bottom line of the sewer along the line thereof indicate such condition, and then tells the bidder where such borings may be found and that such borings should be inspected, examined and interpreted by the bidder. Plaintiff's evidence is that it did inspect and examine the borings or cores made by the diamond drill but that same were in such bad shape, not labeled, and so intermingled and broken that it could not obtain therefrom accurate information of the kind of rock formation through which the tunnel was to be driven, and that it therefore relied on its being in solid rock. Plaintiff's evidence, however, shows that the borings disclosed that the formation was not solid rock without layers or ledges of limestone separated by bedding seams. A chart of the borings showing the formation encountered at different depths was at the city engineer's office with the plans and specifications and this showed the rock formation to be stratified with seams of clay, gravel and strata, marked "poor limestone." It was also shown that practically all limestone formation in and about St. Louis was known to be in layers or ledges with seams of varied thickness and material between same. The plaintiff was certainly warned that the city in letting the contract was not warranting the formation to be solid rock. Plaintiff's engineer testified that the cores taken out by the drill could not do more than show the character of the rock at the particular place through which the drill passed and that the correct interpretation of such borings by a skilled engineer or geologist was

the matter of vital importance, and that such interpretation must be made by the bidder himself. The further statement of the contract that "the classification of materials shown on the plans, while believed to be substantially correct, shall not form the basis of any claims by the contractor in case the materials encountered prove to be different from the interpretation given on the plans" defeats the plaintiff's claim in this respect. The plaintiff was under no obligation to make a bid for doing this work and if the plans and specifications and the sources of information referred to were so deficient or inadequate that it could not make an intelligent bid and contract, it should have refrained from doing so. The rock line marking the beginning of the rock formation beneath the surface shows a depth of 40 feet or more of rock formation above the sewer tunnel, and the fact that the contract required only 10 feet of rock roof over the sewer arch in the C type of tunnel and a less thickness for the B type and still less for the A type indicated that solid rock throughout was not expected. Such also is indicated by this provision of the contract:

"The contractor shall be responsible for the proper support of the tunnel roof and walls, and work must be carried out so that there will be no subsidence or settlement to cause damage to existing improvements. Timbering shall be used where desirable, and, if necessary, shall be left permanently in place. Timbering so used shall be placed so as to clear the outside lines of the concrete lining and spaces around and between the timbers shall be filled with the same class of concrete as the tunnel lining. The cost of such timbering and extra concrete shall be considered as being included in the prices bid per lineal foot of completed tunnel."

As we have heretofore noted, the price to be paid by the city was fixed by the contractor's bid of so much per lineal foot of sewer tunnel complete, based on the inside dimensions of the sewer, either 5 or 7 feet, plus the thickness of the sewer lining designated for Types A, B, or C, and we have noted plaintiff's bid per lineal foot of the various types and dimensions. The contract then provides:

"The price bid per lineal foot of 'Tunnel Complete' of the particular section used shall include the whole cost of excavation and disposal of all materials of every description that may be encountered to the cross-sections specified; . . . it shall also include the cost of *excavation* and the necessary *backfill* with Class A Concrete, *where excavation is made beyond outside lines called for;* where conditions are encountered calling for timbering it shall also include the cost of timbering and *extra concrete necessary;* it shall also include the whole cost of furnishing materials, tools, forms, labor and such incidental work as pumping and lighting as may be necessary for the placing of the concrete lining of the completed tunnel section as specified herein."

There is but one exception to this, which is in these words: "Except the excavation hereinbefore described to be paid for at the price bid for 'Excavation for Enlargement of Section.' " This exception is also referred to in this provision of the contract: "Payment for all excavation in tunnel, except as specified under the paragraph titled 'Excavation for Enlargement of Section,' *shall be included in the price bid per lineal foot of completed tunnel section of the type used."* This excepted item of "Excavation for Enlargement of Section" is the only exception from the provision of the contract that the amount bid per lineal foot shall be payment "for all excavation in the tunnel" and "the whole cost of excavation and disposal of all material of every description that may be encountered" and "shall also include the cost of excavation and necessary backfill with Class A concrete, where excavation is made beyond the outside lines called for," etc., and is set forth in the contract in these words:

"In places where the Contractor, at the direction of the (City) Engineer, has made his excavation for one type of section and *test holes driven upward show that the cover is such as to require a heavier type of lining,* the contractor shall enlarge the section to permit the change. Such extra excavation will be paid for at the price bid per cubic yard for 'Excavation for Enlargement of Section.' The *amount* of such excavation to be paid for will be the *difference in area of the required linings* of the two sections involved in the change."

The amount of "Excavation for Enlargement of Section" was 200 cubic yards according to the city's original estimate, and plaintiff's bid on this was $20 per cubic yard. Plaintiff was allowed by the city engineer's final estimate for 3.70 cubic yards, amounting to $74, and was paid this amount. We think it is plain that no recovery can be had in this action for "Excavation for Enlargement of Section" for the reason that compensation can be claimed under this heading only when the evidence shows that (1) the contractor, at the direction of the city engineer in charge, has made and caused its excavation for one type (B or C) of either a 7 or 5-foot tunnel and (2) it is then determined by test holes driven upward that (3) the cover (thickness of the overlying rock) is such (so thin) as to require a heavier type of concrete lining, and (4) the contractor has enlarged the section after it has once been excavated to permit the changes. There is no evidence that this was done in any instance. In no case, after the plaintiff had excavated for a B or C type of tunnel of either 7 or 5 feet in diameter, was it ascertained by holes driven upward or in any manner that the thickness of the overlying rock was so thin that an increased thickness of concrete lining to the tunnel was necessary and the contractor was required to and did enlarge the excavated tunnel for that reason and purpose. The

plaintiff's evidence is that the tunnel was necessarily too large when first excavated.

We also find this provision in the contract:

"The (City) Engineer will designate, in advance of excavation, the type of section which he desires to use. The contractor may excavate as he deems desirable, provided that in all cases the excavation shall be of sufficient size that the full thickness of concrete lining, as shown on Sheet 10 of plans, can be placed. Any *excess excavation made outside the outside lines of the concrete lining* shall be *refilled* with the same class of concrete as the tunnel lining. All such cost of extra excavation and extra concrete shall be considered as being included in the prices bid per lineal foot of completed tunnel."

Plaintiff's evidence is that the defendant's engineer did not at any time, or at least as to most of the sewer, designate in advance of the excavation the type of sewer to be used in the section then under construction. There is no evidence, however, that he refused to do so. It may be, as plaintiff claims, that the character of the rock formation encountered made it impractical, if not impossible, to do so. The evidence shows that it was to plaintiff's advantage and at its solicitation that the provision requiring the city engineer to designate in advance the size and type of the tunnel sewer necessary or desired was not complied with. Soon after the work was commenced the plaintiff requested in writing that "on account of possibility of surface water coming through test holes driven in roof to determine section to be used we request that we be allowed to drive tunnel as though a 7C section would be required and make the test holes when trimming is in progress in this section of tunnel, that is, from about station 600 north. . . . In case any point is found where a 7B or a 7A section is necessary, the extra excavation and concrete required would be done and placed as though these 7B or 7A sections *had been ordered by the engineer before excavation.*" It was manifestly to plaintiff's advantage in constructing either a 7-foot or 5-foot sewer to be allowed to proceed on the theory that the type of sewer requiring the least excavation and least concrete lining would suffice because if the tunnel was found to be too small and had to be enlarged to accommodate a larger type, that is, a type with thicker concrete lining, plaintiff would under the contract be entitled to extra pay for the enlargement; and doubtless the plaintiff had found that on account of the stratified rock formation the excavated tunnel was always too large and required too much backfilling with concrete. On account of these difficulties plaintiff at times tried to drive in the first instance a tunnel smaller even than the C type. In any event plaintiff cannot complain that the city permitted it to proceed with the work in its own way and at its request without dictating in advance the type of sewer to be used.

Our conclusion is that plaintiff is not entitled to recover the sum of $69,210.75, or any part thereof, demanded as the first item of the first count of the petition, for refusal of the defendant and its engineer to classify and pay for sewer as Type B construction instead of Type C.

The second item of the first count of the petition is for $13,233.78 for 544.6 cubic yards, 14,704.2 cubic feet, of extra concrete used in constructing the sewer in question at 90 cents per cubic foot, the price bid by plaintiff for extra concrete. The amount of "extra concrete" specified in the city's estimate on which the bids were invited and the contract made was 2700 cubic feet. The amount allowed and paid for on the final estimate was 8150.24 cubic feet, amounting to $7,335.22. The only provision of the contract for paying for extra concrete is this:

"If any mud seams are encountered and the (city) Engineer deems it necessary that some or all of this material be removed, *outside the regular tunnel section,* the contractor shall remove such of it *as ordered* and refill the excess space with Class A · Concrete. Payment for this work will be made at the price bid per cubic yard for 'Extra Concrete,' which price shall include all cost of excavating the faulty material and of refilling the space with concrete."

We do not find any evidence in the record showing that mud seams were anywhere encountered, the material of which outside the regular tunnel lines the engineer found necessary to have removed and so ordered and which the plaintiff did remove and refill with concrete. The plaintiff in its petition couples this provision, for removing mud seam material and refilling same with concrete, with what is designated as "bad ground conditions" which were encountered and on account of which plaintiff says in its petition "the defendant's engineer in charge did order and direct plaintiff to remove material, and material was removed by plaintiff pursuant to said orders, and that by reason of such removal and falling and breaking of rock attributable to such bad ground conditions, plaintiff was required to use and did use and install in said tunnel sections hereinbefore described, 284.3 cubic yards of concrete in excess of normal 7B section, and 260.3 cubic yards in excess of 5B section, where tunnel lining was installed as aforesaid." This brings up the same "bad ground conditions" which we have already discussed. What we have said disposes of this contention as an assumed risk on plaintiff's part. The mud seam material, for removing which and refilling the vacant space with concrete the plaintiff was to receive extra pay, was mud seam material found outside the tunnel lines and removed from there by order of the city engineer, and has no reference to loose material falling in the course of the work or thereafter to the bottom of the excavated tunnel and necessarily removed from there because obstructing the tunnel. It is enough to say here that plain-

1020

tiff's evidence does not sustain a claim for removing on defendant's order the material of mud seams encountered outside of the tunnel lines and replacing same with concrete, and the contract provides for paying for extra concrete under no other circumstances. Recovery for this item must be ruled against plaintiff as a matter of law.

We might say here that plaintiff's petition and its evidence reflects the idea that it is entitled to recover on *quantum meruit* coupled with statements and promises of the city engineer in charge and the president of the Board of Public Service made in the course of doing this work rather than under the terms of the written contract. The petition stresses the idea that defendant represented and contracted on the theory that the tunnel was to be driven through solid limestone rock, free from mud seams, fissures, laminations, or bedding seams, and when it was discovered that these things existed in the rock formation there arose an implied promise, supplemented by the verbal promises, to pay the amount earned based on the amounts actually excavated and the amount of concrete actually used. The evidence took a still wider range and plaintiff was allowed to prove that defendant's engineers in charge, in view of the bad rock conditions found and excessive cost of constructing the sewer, promised and agreed that they would reclassify the work and grade it as 7B or 5B instead of 7C and 5C, so as to cover and pay for the actual amounts excavated and the concrete actually used; "that it was and would be the policy of the city when a good job was done and in schedule time, and unforeseen conditions arose, to see to it that the contractor did not lose money." The president of plaintiff company testified:

"We were not asking for the actual amount we did. We were leaving it up to the City to give us exactly what they said they would —pay us out on the job. We were not even asking for a profit, but simply asking to be paid out what we were in. We were not even asking for the capitalization of our company.

"Q. You were asking that the sections classified as C be changed to sections of type A and B, is that right? A. Yes. I don't want you to think that we were asking specifically for any one thing. We were asking to be paid out on the job. Mind you, you have to get this impression—that these relations were friendly, always. We were expecting them to be gentlemen of their word and we did not say specifically 'Give us so much A or so much B.' It was a friendly feeling, whereby we expected them to live up to their own verbal agreement.

"Q. And that verbal agreement, as I understand, was that Mr. Kinsey (head of the Sewer Department) promised that part of the work would be reclassified from one section of work to a higher classification? A. Yes, sir."

This shows an erroneous view of the law. Work of this character

must be let on competitive bidding and to the lowest bidder. Section 2962, Revised Statutes 1929, requires that contracts of this character made by municipalities must be made in advance of doing the work and in writing, which shall specify the price to be paid. The contract cannot be modified, changed or enlarged by verbal promises, and any such promise to pay more for the work than the contract provides is void. Municipal officers have no such powers and can do nothing except to see to it that the contract is complied with as made and the work and material paid for as the contract specifies. The intent of the law is to place all bidders and contractors on an exact equality without chance of favoritism, and when the contract is once made the officers in charge of the work are executive and not contracting agents of the city. [Mullins v. Kansas City, 268 Mo. 444, 188 S. W. 193; Leathers v. City of Springfield. 65 Mo. 504; Likes v. City of Rolla. 184 Mo. App. 296, 167 S. W. 645; Burke v. City of Kansas. 34 Mo. App. 570; Wilson v. St. Joseph, 125 Mo. App. 460, 102 S. W. 600.]

The second count of the petition is for $30.886.87 damages for defendant's violation of the contract in that it wrongfully prohibited the plaintiff from blasting rock in excavating the tunnel between the hours of eleven o'clock at night and six o'clock in the morning. The use of explosives in driving the tunnel through rock was of course necessary. The only provision of the contract in relation to the use of explosives is this provision under the caption of "Blasting:" ". . . The time of firing shots shall be arranged so as to cause the least amount of annoyance to residents in the vicinity." The evidence is that the section of the city where this sewer was being constructed was a thickly populated residential neighborhood, there being residences on nearly every lot. Blasting necessarily caused considerable noise and annoyance and especially at night. In connection with the letting of the contract or soon thereafter plaintiff inquired of the city officials as to what regulations would be required as to blasting rock and was informed that blasting should not be carried on between ten o'clock at night and six o'clock in the morning. At plaintiff's suggestion the time was fixed at eleven o'clock at night to six o'clock in the morning. Both parties acquiesced in this with little. if any, protest or controversy. The evidence shows that this regulation was not rigidly enforced as plaintiff was allowed in cases of emergency to discharge shots after eleven o'clock at night or before six o'clock in the morning. No claim for damages on this account was made till the controversy arose as to the amount due plaintiff for construction work. Complaints as to the blasting at night were more or less frequent and for the most part emanating from the "City Hall." Plaintiff intimates that these complaints had more or less to do with political conditions, but defendant says it was natural that the complaints would first be made

to the City Hall. However that may be, the city properly had regard to the peace and safety of its citizens in having work of this character done and the contract contemplated that reasonable regulations would be made and observed in blasting out this tunnel. There is no evidence that such regulation was not reasonable. Plaintiff's theory is that had its use of explosives been unrestricted and had it been allowed to fire shots in blasting whenever it got ready, it could and would have used three shifts of eight hours each in doing the work, instead of two of ten hours each, and thus saved time, expense of overhead, etc. Neither party has cited any case as authority or precedent on this proposition and it is one of first impression. We might take judicial notice that seven hours is not unreasonable during which people shall be allowed to sleep undisturbed by blasting and that between eleven o'clock at night and six o'clock in the morning is the most usual time to sleep. Under the evidence, or rather lack of evidence, this item of damage should not have been submitted to the jury and the court should not have granted a new trial thereon.

The third and last count of the petition is for damages on account of plaintiff not being allowed to crush stone taken from the tunnel at the site of the work for use in making concrete. The contract provides that

"All excavated material removed from the tunnel shall become the property of the contractor. He may use such of the rock as is suitable for coarse aggregate for concrete, but the remainder of the excavated material shall be removed from the site of the work. None shall be placed on private property unless the written consent of the owner or owners thereof has been filed with the Engineer."

The plaintiff's evidence, though vague and a conclusion of the witness, is that had plaintiff been allowed to crush the rock at the site of the work, it could have crushed rock taken from the tunnel and used same in making concrete instead of having to buy crushed rock at a larger cost than crushing it at the place of the work; but if it had to haul the rock even for a short distance and then haul it back after being crushed it would cost as much or more than to buy the crushed material. We fail to see, however, wherein not permitting plaintiff to crush the rock at the site of the work is a violation of the contract. The contract says plaintiff may use such of the excavated rock (it being the owner) as is suitable for coarse aggregate for making concrete, but must remove the rest. It says nothing about where or how the excavated rock shall be crushed or prepared for such use, and defendant made no promise in the contract or out of it as to furnishing a place for crushing it. As we understand it, the only available place for crushing the rock which the city controlled was the public streets. Plaintiff's chief engineer testified that a rock crusher was quite noisy and created dust, and, as we have said, this was a thickly populated neighborhood. The evidence is very

meager and indefinite. All that is shown is that the city engineer in the very beginning told plaintiff it could not crush the rock at the site of the work and this matter was then dropped and never brought up again till the work was completed. Plaintiff's president testified:

"This direction that we must not crush the rock at the site of the operation was given practically at the very first conversation at which the members of our company were introduced to Mr. Horner (city engineer). That was before the work started. It was a peremptory dismissal of the subject and the contemplation was to establish friendly relations. The matter was disposed of conclusively at that time."

It is difficult to say whether plaintiff's cause of action on this count sounds in tort or on contract, but, under the facts shown, plaintiff cannot recover.

█ If we are wrong in any of our above conclusions, there is another reason why plaintiff cannot be allowed to recover. The contract sued on contains this stipulation:

"To prevent all disputes and litigation, it is further agreed by the parties hereto that the President of the Board of Public Service shall, in all cases, determine the amount or quantity, or the classification of the several kinds of work or materials which are to be paid for under this agreement, and that he shall decide all questions which may arise relative to the performance of this contract on the part of the contractor, and his estimates and decisions shall be final and conclusive."

This was a wise and binding provision of the contract and was intended to prevent just such litigation as this. We have found it difficult to understand the facts in the case and to apply the same to the contract provisions. We are sure that the jury and trial court labored under the same difficulties. The contract deals with an engineering proposition, abounds in technical and scientific terms, and was to be carried out by men learned in that line of work. An expert in that line of work was best fitted to interpret the contract and solve the controversies and differences of opinion that might arise. The President of the Board of Public Service of St. Louis was a proper man to act as such final arbiter. That such an arbiter might abuse his power and act corruptly or fraudulently is possible and in such case the court should refuse to enforce such provisions. Such provisions of contracts like this, in the absence of a showing that the person chosen as arbiter acted arbitrarily, fraudulently or in manifest error in making his decision on any point, have frequently been upheld and enforced by the courts. [Universal Const. Co. v. St. Louis, 284 Mo. 89, 99, 109, 223 S. W. 931; Williams v. Chicago, S. F. & C. Ry. Co., 112 Mo. 463, 487, 494, 20 S. W. 631; Dinsmore v. Livingston County, 60 Mo. 241.] It is held in the

Williams case, supra, that the mistake which will relieve the plaintiff of the binding force of the decision of the arbiter agreed upon must be a mistake, not of the judgment of the arbiter, but as to the facts on which the judgment is based, and that the mistake must be so gross as to necessarily imply bad faith; that where fraud is relied on the facts constituting the fraud must be pleaded. In this case the plaintiff pleaded that the contract provided that defendant's engineer was to and did make monthly estimates of the work completed and materials furnished as a basis on which monthly payments were made, and that when the work was completed such engineer should and did make a final itemized estimate covering the entire work performed and showing the amounts paid and yet due. Plaintiff embodied this final estimate in its petition. While not pleading the clause of the contract last quoted, the plaintiff evidently anticipated this defense and pleaded that "in its said approximate and final estimates, its said President of the Board of Public Service, through fraud and error and mistake and arbitrariness and caprice, has failed to consider, and has ignored, plaintiff's rights to have such construction so classified and paid for under the provisions of said contract requiring the defendant to pay the plaintiff the unit prices agreed upon for the type of construction actually used, and has arbitrarily and fraudulently and capriciously and erroneously and mistakenly classified said construction as C type and paid therefor the lower unit price provided in said contract for C type of construction." This allegation is reiterated several times in general language, without setting out any facts, that in classifying the tunnel construction as Type C instead of Type B the city engineer and the President of the Board of Public Service acted capriciously, arbitrarily, fraudulently, and erroneously. We find, however, no evidence whatever of fraud or bad faith on the part of the city engineer or the President of the Board of Public Service. There is no evidence to support a finding that these public officials acted otherwise than in good faith and in an honest exercise of their best judgment. The plaintiff by its instructions sought to have the jury find that "the defendant knew that said sewer was Type A or Type B sewer and that defendant, in classifying it as 5C type, did so arbitrarily and capriciously and not under a bona fide claim or relief that it was 5C type." There was no evidence to support such a finding. We must hold, therefore, that the final estimate as made by the city engineer and approved by the President of the Board of Public Service, after due investigation and a hearing and consideration of plaintiff's claims, was final and binding on this plaintiff.

It was also shown that, after the making and filing of the final estimate and after it was known to plaintiff that defendant took the position that it did not owe the plaintiff anything more than the balance shown to be due by such final estimate and was offering such

balance in full and final settlement, the plaintiff accepted payment of such balance of $1,852.71 and signed a receipt stating that same was "in full payment of the above account." There are authorities to the effect that when one party to a disputed account offers the other a certain amount in full payment and satisfaction of the account, and the other party accepts the amount offered under an express agreement that it is in full settlement and discharge of the disputed claim, then he will not be heard to say or contend that such sum was only a partial payment of the amount due. He must accept the offer as made or not at all. Whether there is anything in this case to bring it within some exception to the above rule, we need not consider in view of what we have already decided.

The result is that the judgment granting plaintiff a new trial is reversed and the cause is remanded with directions to reinstate the verdict for defendant and to enter judgment accordingly. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.*, absent.