CHRIS NELSEN & SON, INC., *v.* CITY OF MONROE.

1. MUNICIPAL CORPORATIONS—WATER MAIN—BIDS—SUBSOIL—FRAUD.
   A city is not obligated to furnish any computation as to amount of rock to be removed in the construction of a water main when seeking bids for such work, but simply to make no false statement to a bidder as to such matters.

2. SAME—WATER MAIN—IMPLIED WARRANTY AS TO SUBSOIL CONDITIONS—SOUNDINGS.
   City neither warranted nor guaranteed average height of rock between 2 soundings made for water main construction where instructions to bidders as to subsoil condition specifically stated the soundings made were merely evidence and that the bidder must assume entire responsibility for any conclusions he drew from the drawings upon which the soundings made had been recorded; the implied warranty of the city extending only to the accuracy of the soundings made.

3. APPEAL AND ERROR—NONJURY CASE—PREPONDERANCE OF EVIDENCE—SUBSOIL CONDITIONS.
   Finding of trial judge in nonjury case that plaintiff contractor had failed to sustain its burden of showing by a preponderance of the evidence that soundings and data which city had caused to be made for construction of water main were inaccurate is sustained, where Supreme Court is unable to say that the evidence clearly preponderates in the opposite direction.

Appeal from Monroe; Golden (Clayton C.), J. Submitted June 4, 1953. (Docket No. 33, Calendar No. 45,750.) Decided October 5, 1953.

Assumpsit by Chris Nelsen & Son, Inc., a Michigan corporation, against City of Monroe for money

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 38 Am Jur, Municipal Corporations § 502.
[3] 3 Am Jur, Appeal and Error §§ 888, 889.

claimed due for excavation of rock in excess of amount included in bid. Judgment for defendant. Plaintiff appeals. Affirmed.

*Dell & Heber,* for plaintiff.

*Victor H. Weipert (William J. Weipert,* of counsel), for defendant.

REID, J. Plaintiff sued defendant for cost of removal of 1,876 cubic yards of rock excavation over and above the amount claimed by plaintiff to be indicated by drawings and evidence furnished by defendant to plaintiff to procure plaintiff's bid for construction of water main. On trial before the court without a jury, the court found for the defendant and rendered judgment accordingly. Plaintiff appeals.

The contract in the obtaining of which bids were publicly requested by the city, covered the installation of a water main approximately 8 miles long, from Stony Point to the city of Monroe, much of the course being alongside of the Pointe Aux Peaux road. The city furnished plaintiff company all the data known and available to the city except that the plaintiff claims the indication of total rock excavation necessary was misinformative and faulty evidence.

Neither the pleadings nor the testimony of any witness for the plaintiff alleges any bad faith on the part of the city or its agents. The action is in assumpsit and is based solely upon the furnishing of faulty and incorrect information. The plaintiff, in the instant case, seeks only to recover that which will compensate it for the damages suffered as a direct result of the breach of the city's implied warranty of the accuracy of the data furnished.

The city made no computation of the total rock yardage to be removed, and was under no obligation to furnish any such computation; it was simply under obligation to make no false statement to plaintiff, and the claimed inaccuracy and falsity of the soundings made by the city hereinafter mentioned is the sole basis for plaintiff's claim. Plaintiff offered no proof that any one or more of the soundings shown on the diagram relied on by plaintiff in making its bid and entering into the contract, was false or incorrect, as a sounding at the very point or points indicated on the diagram.

Plaintiff's witness Korneffel (who as subcontractor did the explosive work on the job in question) testified:

"If you insist on 3, 4, and 5 feet from that particular spot as the actual sounding I have nothing in the way of evidence to show that the sounding as taken by the engineers employed by the city of Monroe where taken were incorrect."

Mr. Goodwin, engineer employed by the city on the contract in question, was present at most of the soundings and testified as to the manner of making the topography survey and the test soundings in question, as follows:

"We drove the 5/8ths tool steel bar into the ground with 8- and 10-pound sledges until we encountered an obstacle. We pulled it up and moved a couple of feet and drove it again; if we stopped at about the same point we call that rock; if we went down farther we surmised that it was a free boulder. We didn't do the same as Mr. Nielsen [vice-president and secretary and engineer for plaintiff company] if we hit a hard object the first time. After a pattern had been established on the rock formation, we didn't always put the second, third or fourth; sometimes we drove 5 or 6 of them in a circle, but we didn't always do that. After rock had been established in a

plane we would then move 200, 300 or 400 feet. The initial ones were made some 900 feet apart, maybe even farther, and then if we encountered rock we came back in between and tried to pattern the rock formation."

In all 103 soundings were thus taken, all in general proximity to the proposed water main, but few if any, on the precise line of the water main, all of which was indicated on the plan and drawings seen and relied on by plaintiff's engineer before bidding.

Mr. Goodwin further testified:

"When I made these soundings the topography was done, location of the water main and its profile was already drawn up. There was 1 change after the soundings were made; the line was shifted from the north side of the Pointe Aux Peaux road to the south side; not entirely all that, but quite a portion of it. The actual plans and specifications showed that shift.

"The soundings were made in the ditch adjoining the side of the road in which the water main was to be laid. I would say that ditch is an average of 8 or 10 feet from the location of the water main itself. We used the ditch for the purpose of making soundings to save a little work; it was already down, excavated about 3 to 5 feet below road level, so it meant that we didn't have to go through the fill material of the road.   *   *   *   If we showed in any given case that rock was found a definite number of feet below the surface, that would mean the center of the ditch; and the plans and specifications so indicated."

Mr. Goodwin further testified on cross-examination as follows:

"I attempted to make my soundings more accurate than within 1 foot of the level at which the rock would actually be found when the contractor excavated; I do not believe the soundings were accurate within 1/10th of a foot. I think the soundings are accurate

probably plus or minus a foot. The first instruction to bidders that says that they are required to make their investigation, warns the contractor that these soundings are accurate only to within plus or minus 1 foot; I think anybody would realize that the determination of an underground rock structure from soundings and the condition of the rock here to a degree more accurately than plus or minus a foot would be impossible."

Mr. Goodwin further testified that the depth of rock below the surface varied in the 8-mile course of the water main, in one location 2-1/2 feet in 50 feet; in another locality, the variation was 2.8 feet in 180 feet; that in one 3,000-foot stretch there would be approximately a variance of 7 feet; in one locality a variance of 3 feet in 65 feet; that at Sandy Creek there is a variance of 3-1/2 feet over a space of 85 or 90 feet; that the soundings are indicated on the chart or map by a small blue or black dot; telephone or telegraph poles (from which distances and directions to the sounding are shown) are indicated by a circle with a line projecting out on each side; that the symbols are not drawn to a scale, you would not be able to see them on a scale of 1 inch to 100 feet, and that the soundings were made in January and February, 1947.

Plaintiff's engineer (in at least practical effect) for this job, Robert Nielsen, who is also plaintiff's vice-president and secretary, had seen the advertisement for the letting of the contract in question about 1 month before the letting, August 23, 1948; but plaintiff did nothing during that month to obtain more detailed information as to rock depths along the line of the water main instead of near it. Nielsen testified it would have taken him and 2 men 2 weeks to make the same number of soundings indicated on the city's drawings. He said:

"We didn't make any test borings because we assumed the blueprints to be correct, the cost was prohibitive, and there wasn't sufficient time before the bidding."

The plans and specifications were sent plaintiff the same day that plaintiff asked for them, August 2, 1948, or 21 days before the bids were opened.

To contradict the testimony of Mr. Goodwin, defendant's witness, as to the accuracy of his soundings, plaintiff relies, 1st, on certain computations of rock yardage made, as plaintiff claims, as a fair deduction from the soundings made by Goodwin and by the city, as compared with the actual rock yardage shown in the progress of the excavations made for the trench; and 2d, plaintiff claims that its vice-president and secretary, Robert Nielsen, made soundings during the progress of the trial of this case, which showed the inaccuracy of Mr. Goodwin's soundings.

Mr. Nielsen as a witness testified:

"We made 15 or 16 such tests."

Later on he testified,

"In 2 days we made a total of 18 soundings."

On direct examination, Nielsen testified:

"At approximately station 81 *I found rock.* The rock there was about 6 inches above the rock shown on the city's charts." (Italics supplied.)

On cross-examination he testified,

"At station 81 *I found no rock.*" (Italics supplied.)

On direct examination, he testified,

"At approximately station 329 I made a sounding; I found rock; there is no rock shown on the city's drawings at that point;  *  *  *  it was about 12 inches above the city's soundings."

On cross-examination he testified,

"At station 329, the city plans and specifications show no rock; they do show a sounding; the depth of the sounding is shown; they show no rock at all. I made a sounding there and found rock at approximately at the depth of flow line."

The difference between the flow line and the bottom of the trench is elsewhere shown as 9 inches.

Of 18 soundings Nielsen claims he found the city's soundings incorrect in 7 instances but contradicts himself in 2 of the 7 instances.

The 3 above-noted discrepancies in Mr. Nielsen's testimony tend to indicate in him some inaccuracy as a witness.

It is further to be borne in mind that the soundings claimed by Mr. Nielsen to have been made by him, were made in April, 1952, over 5 years after the soundings were made by Mr. Goodwin. Mr. Nielsen relied in several instances on a notation on the city's survey of a pole standing, and there is no showing that in the 5 years, a different pole had not been placed in the locality replacing the pole referred to in the city's diagram of soundings. Mr. Nielsen testified,

"They could have moved a pole for all I know."

Further, Mr. Nielsen testified that he made only 1 sounding at any 1 locality and didn't know whether he happened to hit a stone or free boulder in the ground. This left it possible that Nielsen's driven steel rod had come in contact with a free boulder and thus that the sounding would be inaccurate by the thickness of the free boulder plus its height above the rock and to that extent the indication as to rock be that much higher than the correct level of the ledge rock in that particular locality.

The rock was not exposed by excavating before the blasting. Mr. Korneffel testified:

"In a good portion of the job we drilled through the overburden, which is the earth about the rock; we drilled through the overburden into the rock itself and loaded the rock below the overburden; we would drill a series of holes spaced at intervals which were conducive to good breakage, and load a series of holes and, of course shot them off. To aid in this blasting was the use of mille-second delay caps, which reduced vibrations caused from blasting to the number of holes for each particular delay. After that rock was blasted Chris Nelsen & Son would excavate as much as they could, and there was approximately 20% that had to be re-shot there in the open ditch, then it would have to be covered with rope mats or some sort of covering. We would drill right through the earth and put the explosive into the rock; we wouldn't actually see the rock until the blasting had been done."

No demand seems to have been made on the city on account of excessive amount of rock blasting over and above that deducible from the city's soundings, until after the water main had been placed and the trench refilled. This suit was begun April 19, 1950.

The record discloses considerable doubt as to the "original" estimate made by plaintiff, before its accepted bid for the job, of the rock yardage required in making the trench. Korneffel testified he estimated (as subcontractor) the amount at 4,600 yards, but used 5,000 as the basis for bidding. He says he estimated it several times and came within 200 or 300 cubic yards each time. He testified on cross examination:

"The one sheet which I have already shown you is the only estimate of rock to be removed that I have. As I said once before that was the third one; the other 2 were destroyed."

Korneffel's offer or bid on which the subcontract for blasting was awarded to him by plaintiff, is not shown in the record as an exhibit.

Plaintiff's method of estimating from the city's soundings the total yardage of rock necessary to be removed, is not in clear language stated in the record, but it seems that plaintiff in submitting its bid, had estimated the rock yardage on the assumption that the rock between 2 soundings was of the same average height as the average height of the 2 soundings. This was a pure assumption, not warranted nor guaranteed by the city.

Defendant's instructions to bidder contained in part the following:

"Subsoil conditions. Soundings for bed rock have been made and depths to rock or depth of sounding are recorded on the drawings. This information is offered to the bidder merely as evidence and the bidder himself must assume entire responsibility for any conclusions which he may draw from it."

The city made no computation itself nor did it submit any computation of the rock required to be blasted.

The implied warranty by the city only extended to the accuracy of the soundings made. The plaintiff assumed entire responsibility for the correctness of the averaging method adopted by plaintiff because the "average" is based on plaintiff's conclusion.

Mr. Nielsen testified:

"If the company had, in fact, encountered less rock than actually anticipated no refund would have been made to the city of Monroe."

The trial court found that plaintiff has not satisfied the burden resting on it, under its theory of the case, to show by a preponderance of the evidence

inaccuracies of defendant's soundings and data thereon.

In arriving at his conclusion, the trial judge must have believed the testimony of Mr. Goodwin as against any inference arising from guesswork computation relied on by plaintiff to show that the soundings were inaccurate. At best plaintiff could only be said to have proven that the rise of the rock above the average line between soundings amounted to more than the depressions between the soundings.

Plaintiff's brief disclaims any allegation of bad faith on the part of the city or its agents. Mr. Goodwin's methods and practice in making the soundings were more painstaking and apparently more accurate than Mr. Nielsen's work and Mr. Goodwin seems a more reliable witness.

We cannot say that the evidence clearly preponderates in the opposite direction from the trial court's finding. There is, accordingly, no necessity of determining the law that would be applicable to plaintiff's case, if his alleged facts had been found proven, *e.g.,* as the law is laid down in the cases cited by plaintiff, *Hersey Gravel Co.* v. *State Highway Department,* 305 Mich 333 (173 ALR 302), and *W. H. Knapp Co.* v. *State Highway Department,* 311 Mich 186. The law as laid down in those 2 cases is simply inapplicable because plaintiff's case is not proven on the facts, as found by the trial court, which finding we affirm.

The judgment for defendant of no cause of action is affirmed. Costs to defendant.

DETHMERS, C. J., and ADAMS, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred.

BOYLES, J., did not sit.