[L. A. No. 28983.   In Bank.   Feb. 10, 1967.]

THEODORE G. WUNDERLICH et al., Plaintiffs and Respondents, v. STATE OF CALIFORNIA EX REL. DEPARTMENT OF PUBLIC WORKS, Defendant and Appellant.

---

*Assigned by the Chairman of the Judicial Council.

Thomas C. Lynch, Attorney General, Walter S. Rountree, Assistant Attorney General, George M. Goffin, Deputy Attorney General, Harry S. Fenton, Kingsley T. Hoegstedt, Orrin F. Finch, William S. Ashton, Jr., Ronald A. Zumbrun and Richard W. Bower for Defendant and Appellant.

Harold W. Kennedy, County Counsel (Los Angeles), Lloyd S. Davis, Chief Deputy County Counsel, P. A. Towner, Robert W. James, William L. Berry, Jr., Bertram McLees, Jr., County Counsel (San Diego), David B. Walker, Deputy County Counsel, Keith C. Sorenson, District Attorney (San Mateo), and John B. Segall, Deputy District Attorney, as Amici Curiae on behalf of Defendant and Appellant.

Monteleone & McCrory and David P. Yaffe for Plaintiffs and Respondents.

Thelen, Marrin, Johnson & Bridges as Amici Curiae on behalf of Plaintiffs and Respondents.

PEEK, J.*—Defendant State of California appeals from a judgment based upon its alleged breach of warranty with respect to a source of materials available to plaintiff contractors for the construction of 14.4 miles of state highway in Riverside County.

In April 1954 plaintiffs, as prospective bidders on the project, were furnished by the Department of Public Works a copy of the "Special Provisions, Proposal and Contract," a document which provided detailed specifications for the construction of the project, and which provided further that the work was to be done in accordance with the department's "Standard Specifications."

Pertinent portions of the Special Provisions read as follows: "Chapter II. SPECIAL REQUIREMENTS (a) General. Attention is directed to Section 6 of the Standard Specifications . . . (c) Local Materials. Attention is directed to Section 6, articles (b) and (f), of the Standard Specifications. . . .

"Samples indicate that material of satisfactory quality for the production of imported base material, gravel blanket material, and mineral aggregate for plant-mixed surfacing

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

and cement treated base, may be obtained left of approximate Station 615. Arrangements have been made for the Contractor to obtain material at the above location at a price not to exceed ¾-cent per ton for material removed from the site and used in the work.''

Section 6 of the Standard Specifications provided in part: ''(b) . . . When sources of materials to be furnished by the Contractor are designated in the special provisions, the Contractor shall satisfy himself as to the quantity of acceptable material which may be produced at such locations, and the State will not assume any responsibility . . . as to the quantity of acceptable material at the designated location.

''If tests have been made by the State of other locations in the vicinity, the results . . . are available to the Contractor or to prospective bidders on inquiry at the office of the district in which the work is situated. . . . This information is furnished for the Contractor's or the bidder's convenience only and the State does not guarantee such tests and assumes no responsibility whatsoever as to the accuracy thereof or the interpretation thereof stated in the test records. . . .

''Should the Contractor elect to obtain material from sources designated in the special provisions, he shall pay such charges as are specified. . . .''

In addition, section 2 of the Standard Specifications, ''PROPOSAL REQUIREMENTS AND CONDITIONS,'' provides that: ''(c) . . . The bidder shall examine carefully the site of the work. . . . It will be assumed that the bidder has investigated and is satisfied as to the conditions to be encountered, as to the character, quality and quantities of the work to be performed and materials to be furnished, and as to the requirements of these specifications, the special provisions and the contract.'' The remainder of the section declares that the state will not guarantee nor accept responsibility for the accuracy of preliminary investigations or their interpretation where made by the state ''in respect to foundation or other design.''

The state conducted a ''job-showing'' at the project site on May 7, 1954, at which plaintiffs were represented by their estimator. The representative of the Division of Highways of the Department of Public Works brought with him copies of the plans and specifications, and test reports of mineral sources convenient to the project site. One of the documents was an interdepartmental memorandum dealing with the condition of these sources. Plaintiffs' estimator was aware

that test reports used to compile the memorandum were available for inspection at the division's district office, but he utilized the memorandum alone, after a brief inspection of the area, in forming an opinion as to the adequacy of the sources.

Plaintiffs chose to use the "Wilder pit," about which the present controversy centers, as a source of the specified materials. With reference to that pit the memorandum provided: "Submitted herewith is information concerning possible local material sources for the project. . . . This information has been developed during the investigation for borrow sites and possibly would be of value to the prospective bidders for this project. . . . *Hillside Left of Station 600 D to 625 D.*

"This hillside is composed of rather loosely compacted *sand and gravel ranging from 4 inches to dust.* A layer of blow sand covers the base of the hill and apparently exists in spots on the slope as *some test holes encountered considerable coarse material while others were practically all sand.*

"*Tests indicate* that after processing, to meet the grading requirements, *the material is suitable* for imported base material, cement-treated base aggregate, gravel blanket, and plant-mixed surfacing aggregate. . . .

"This source is well located as far as economy of hauling is concerned considering a single source of material for the entire length of the project. With this in mind, a borrow agreement was negotiated with the property owners by the Right of Way Department for the material on the hillside Left of Station 595 D to Station 615 D." (Italics added.)

The memorandum reproduced the results of tests taken in the above described area of the Wilder pit, stating: "Tests on this material indicate that the material has the following qualifications: . . . 'Passing a No. 4 sieve . . . 55-88%.' " Material passing a No. 4 sieve—containing four wires to the inch—apparently establishes a demarcation between "gravel" and "sand" for the purposes of the project requirements.

Prior to commencing operations, plaintiffs studied other potential sources in the project area, but determined ultimately to utilize the Wilder pit. A few weeks after beginning work plaintiffs complained to the state's resident engineer that necessary materials could not be produced at the bid price from the pit and that it was composed of too much sand. They demanded that the state provide another plant at a different location. The resident engineer ran tests at the pit in

June 1955; results ran from 47.1 percent to 96.4 percent passing a No. 4 sieve. The engineer determined that plaintiffs had not exhausted all the acceptable material at the designated source and refused to approve a shift. Plaintiffs completed the project, first bringing in new equipment for the Wilder site, then using materials from more distant sources.

There is no factual dispute as to the nature of the reports and representations made by the state. There is, however, considerable dispute as to the legal consequences of such representations, and this constitutes the determinative issue before us. Plaintiffs contend that the information furnished by the state with reference to conditions in the Wilder pit constituted a representation and warranty that sufficient suitable material would be available at the pit to complete the project, and that in fact the state misrepresented the conditions, requiring plaintiffs to undertake excess processing at the pit and to ultimately utilize more remote materials sources, with consequent increased costs.

The state asserts that what it represented by the statements reproduced above was only that tests had been taken, that they were accurately reported, and that they did, indeed, indicate that the Wilder pit was a potential source of materials for the project. The trial court, finding that the state had warranted the content of the Wilder pit and had breached that warranty, ordered that plaintiffs recover in excess of $600,000 in damages.

We have heretofore recognized liability based on a theory of breach of an implied warranty when a governmental agency represents as a fact what in fact does not exist, and the claimant is damaged by its reliance on the assertion. ■ "When the state makes a contract with an individual it is liable for breach of its agreement in like manner as an individual, . . . ■ A contractor of public works who, acting reasonably is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented." (*Souza & McCue Constr. Co.* v. *Superior Court* (1962) 57 Cal.2d 508, 510 [20 Cal.Rptr. 634, 370 P.2d 338].) ■ On the other hand, if one agrees to do a thing possible of performance "he will not be excused or become entitled to additional compensation, because unforeseen diffi-

culties are encountered. . . ." (*United States* v. *Spearin* (1918) 248 U.S. 132, 136 [63 L.Ed. 166, 39 S.Ct. 59].)

The crucial question is thus one of justified reliance. ■ If the agency makes a " 'positive and material representation as to a condition presumably within the knowledge of the government, and upon which . . . the plaintiffs had a right to rely' " the agency is deemed to have warranted such facts despite a general provision requiring an on site inspection by the contractor. (*Hollerbach* v. *United States* (1914) 233 U.S. 165, 172 [58 L.Ed. 898, 34 S.Ct. 553].) But if statements "honestly made" may be considered as "suggestive only," expenses caused by unforeseen conditions will be placed on the contractor, especially if the contract so stipulates. (Note 76 A.L.R. (1932) 268, 273; see *Inland Constr. Co.* v. *City of Pendleton* (1926) 116 Ore. 668 [242 P. 842]; *T. E. Kelly & Sons, Inc.* v. *City of Los Angeles* (1935) 6 Cal.App.2d 539 [45 P.2d 223].) Thus, in *C. W. Blakeslee & Sons, Inc.* v. *United States* (1939) 89 Ct. Cl. 226, cert. den. (1940) 309 U.S. 659 [84 L.Ed. 1007, 60 S.Ct. 512], the specifications provided that the materials to be removed were "believed to be mostly sand, with large and small boulders and gravel." Bidders were advised to study the borings data, examine the site and to decide for themselves what conditions actually prevailed. The court held that the government had not misrepresented the conditions of work when more boulders than anticipated were found at the site.

■ In the instant case the memorandum was introduced into evidence to show the meaning of that phrase in the Special Provisions to the effect that "Samples indicate that material of satisfactory quality . . . for production . . . may be obtained left of approximate Station 615." The Special Provisions state simply that samples had been taken from the pit, and that they appeared to point to the fact that there was suitable material in the pit. There was no representation as to quantities in the source, or that a consistent proportion of materials would be found throughout the source. If we consider the memorandum as embracing the whole of the representations made, it does not purport to disclose the average of overall condition of the Wilder pit. It purports to explain, rather, that the pit was composed of sand and gravel, and expressly states that "some test holes encountered considerable coarse material, while others were practically all sand." It forewarns bidders that there might be more sand than anticipated, just as in *Blakeslee* where the reference to

boulders forewarned that plaintiff might find more boulders than anticipated. Although the memorandum accurately reported the fact that borings results ranged from 55 percent to 88 percent sand, this would hardly seem to warrant the conclusion that the pit would average the median of that range, as claimed by plaintiffs. (See *Chris Nelsen & Son, Inc.* v. *City of Monroe* (1953) 337 Mich. 438 [60 N.W.2d 182].)

Had plaintiffs consulted the records they would have found precisely what the memorandum reported. And even though we deem the state's "conclusion" as to what the tests indicated to be a positive assertion of fact as to condition, rather than as an expression of belief or opinion based on facts available to both parties, there is little in the record to indicate that the state did not have reasonable grounds, known also to plaintiffs, for making its statements. (See *Archie & Allan Spiers, Inc.* v. *United States,* 296 F.2d 757, 764.)

There is no positive representation as to the material content of the Wilder pit. The state did little more than report the results of its testing. *"The borings were merely indications,* . . . from which deductions might be drawn as to actual conditions. . . . Both parties knew that deductions so drawn might prove untrue. . . ."* (*Elkan* v. *Sebastian Bridge Dist.* (1923) 291 F. 532, 538.) Both parties could and apparently did draw the same conclusions as to what the tests indicated, and the plaintiffs were given or had access to the identical, accurate information that was available to the state.

What plaintiffs argue, in effect, is that by the presentation of its borings and tests, though accurately reported, the state assumes liability for the contractor's erroneous assumption in bidding that the pit would average approximately a fixed percentage of gravel. This ignores the fact that the state "was simply under obligation to make no false statement to plaintiff, and the claimed inaccuracy and falsity of the soundings made . . . is the sole basis for plaintiff's claim." (*Chris Nelsen & Son, Inc.* v. *City of Monroe, supra,* 337 Mich. 438 [60 N.W.2d 182].)

As in the instant case, there was no proof in *Chris Nelsen* that the tests actually taken were incorrect; and plaintiff there took no private tests because it assumed that the city's plans were correct. It appears in that case at page 446 of 337 Mich. that in submitting its bids, plaintiff "estimated the rock yardage on the assumption that the rock between two soundings was of the same average height as the average height of

the two soundings. This was a pure assumption, not warranted nor guaranteed by the city. . . . The implied warranty by the city only extended to the accuracy of the soundings made.'' Likewise, in *United Construction Co.* v. *City of St. Louis* (1934) 334 Mo. 1006 [69 S.W.2d 639], the court held at pages 1015 and 1016 that there was no warranty of conditions, for ''Instead of guaranteeing that the tunnel will be in solid limestone, the contract merely says that the borings made at intervals . . . indicate such condition, . . . The plaintiff was under no obligation to make a bid . . . and, if the plans and specifications and the sources of information . . . referred to were so deficient or inadequate that it could not make an intelligent bid . . . it should have refrained from doing so.''

In the instant case, too, we may say that on the part of the state there was, at most, ''merely an error of professional judgment. . . . All the information the State had concerning the soil conditions was available to claimant and claimant had been invited to make an investigation of its own. Under these circumstances, the State is not chargeable for claimant's loss. . . .'' (*E. G. DeLia & Sons Constr. Corp.* v. *State* (1955) 1 App.Div.2d 732 [146 N.Y.S.2d 757, 759]; see also *Midland Land & Improvement Co.* v. *United States* (1924) 58 Ct. Cl. 671; *Elkan* v. *Sebastian Bridge Dist., supra,* 291 F. 532.)

■ Whatever the statements may be considered to have represented to bidders, we are nevertheless confronted with the fact that any representation as to the quantity of materials in any of the sources described by the state was explicitly and clearly disclaimed by an express provision of the Special Provisions. At the outset of the same paragraph in which the representation is found, the bidders are referred to section 6 of the Standard Specifications. That section provides expressly that when sources of material are designated, the contractor shall satisfy himself as to the *quantity of acceptable material* which may be produced at the source, and disclaims state responsibility for the quantity of acceptable material. *Hollerbach* and the other cases relied upon by plaintiffs to establish liability of the state do not stand for the proposition that the government may never effectively disclaim the intention to warrant conditions. In the *Hollerbach* cases there was no specific disclaimer (see also *Sartoris* v. *Utah Construction Co.*, 21 F.2d 1), just as there was no indication to bidders of the basis upon which the statement had

been made. In the instant case, however, the very paragraphs containing the alleged warranty contain direct references to disclaimer paragraphs and to a specific disclaimer of the attributes of the source allegedly warranted.

That an alleged warranty may be disclaimed, especially when the statements alleged to constitute the warranty are neither positive nor specific, is made clear in *MacArthur Bros. Co.* v. *United States,* 258 U.S. 6 [66 L.Ed. 433, 42 S.Ct. 225]. The Supreme Court stated, beginning at page 9: ''In considering the opposing contentions there must be taken into account certain provisions of the contract. It is . . . provided that 'it is understood and agreed that the quantities given in these specifications are approximate only, and that no claim shall be made against the United States on account of any excess or deficiency. . . . No allowance will be made for the failure of a bidder or of the contractor to estimate correctly the difficulties attending the execution of the work. . . .' The repellant effect of those provisions and the contentions of the Company,'' the court concluded, ''would seem to need no comment.''

The court in *MacArthur Bros.* distinguished *Hollerbach* and *Christie,* determining at pages 12 and 13 that in the case at bar '''There was indication of the manner of performance but there was no knowledge of impediments to performance, no misrepresentation of the conditions, . . . . To hold the Government liable under such circumstances would . . . cast upon it responsibility for all of the conditions which a contractor might encounter and make the cost of its projects always an unknown quantity.''

It is obvious that a governmental agency should not be put in the position of encouraging careless bidding by contractors who might anticipate that should conditions differ from optimistic expectations reflected in the bidding, the government will bear the costs of the bidder's error. Although there is some evidence that plaintiffs ''relied'' on the alleged representations as to the character of the Wilder pit, the question is whether, under the circumstances of the indefinite nature of the statements and the existence of exculpatory provisions, the bidder could *justifiably* rely on the statements. It does not appear that plaintiffs could have done so, and the state is not responsible for the subjective interpretation placed upon the information by bidders. When there is no misrepresentation of factual matters within the state's knowledge or withholding of material information, and when both parties have equal

access to information as to the nature of the tests which resulted in the state's findings, the contractor may not claim in the face of a pertinent disclaimer that the presentation of the information, or a reasonable summary thereof, amounts to a warranty of the conditions that will actually be found.

The judgment is reversed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J,. and Burke, J., concurred.

Respondent's petition for a rehearing was denied March 8, 1967.