L. A. YOUNG SONS CONSTRUCTION COMPANY, a Utah Corporation, Plaintiff and Appellant,

v.

COUNTY OF TOOELE, Everett De La Mare, James R. Palmer, and George Buzianis, Tooele County Commissioners, Defendants and Respondents.

No. 14893.

Supreme Court of Utah.

Feb. 14, 1978.

---

John Preston Creer of Bradford, Marsden, Creer & Liljenquist, Salt Lake City, for plaintiff and appellant.

Edward A. Watson, Tooele County Atty., Tooele, for defendants and respondents.

MAUGHAN, Justice:

Plaintiff appeals from a judgment in favor of defendant, on its counterclaim. We affirm, and award costs to defendant.

Plaintiff, as successful bidder, entered into a contract with defendant to construct the Tooele Valley Airport, on January 9, 1975. Prior to submitting its bid, plaintiff inquired of the project engineer whether he had any information concerning the water table in the proposed construction area. The engineer showed the available data he had. Plaintiff requested a copy, which was provided.

Plaintiff's work on the base and subgrade was approved by the project engineer. Plaintiff commenced work on the asphalt paving of the project. After laying an initial strip of asphalt, plaintiff was requested to wait until tests could be made before continuing the work; plaintiff refused. As plaintiff continued the work, it received notification of certain deficiencies and departures from specifications, including that the temperature of the asphalt in the windrows was not hot enough. Plaintiff continued the work in order to remove its equipment to another location prior to the Fourth of July holiday. The equipment was removed on July 2, 1975.

The surface of the runway was marked by cracks, checking, bad seams, and was uneven. The surface did not comply with the specifications for smoothness or compaction. Plaintiff's agents testified many of the defects in the surface were attributable to poor workmanship. Plaintiff made some attempts to remedy some of the defects. The F.A.A. refused to approve the work, but it suggested the defects could be remedied by adding a layer of popcorn asphalt to the surface. Plaintiff declined defendant's demand that the defects be remedied at plaintiff's expense. The remaining work required under the contract was not completed.

Prior to the completion date of November 11, 1975, plaintiff initiated this action. In its complaint, plaintiff alleged it had completed the contract. Also, that as part of the information given to it by defendant was a chart showing the water table of the project area, and that the chart was false and misleading; in that the water was located much closer to the surface than was indicted by the chart. As a result of this high water table, plaintiff claimed it had been put to extra expense to complete the contract. Specifically, it was required to supply extra labor and material to improve the soft spots occasioned by the high water table and to incur additional expenses in an attempt to obtain the compaction required. Plaintiff alleged it had been paid $148,-902.69, and it prayed for judgment in the sum of $93,000 which included the unpaid balance under the contract and extra costs.

In its answer, defendant alleged plaintiff had failed to compact and pave the airport landing strip according to the specifications. It asserted that any damage caused to plaintiff was the proximate result of plaintiff's negligence and was not due to any alleged breach of contract by defendant.

Defendant filed a counterclaim, alleging plaintiff had partially performed the work but had failed to fulfill all of the terms of the contract; specifically, plaintiff had failed to meet the compaction and paving specifications. Defendant pleaded that as a result of plaintiff's breach, additional ex-

penditures would be required to remedy deficiencies caused by plaintiff's omissions, or negligence. Defendant further alleged the airport was incomplete and could not be used. Defendant pleaded in the alternative for a decree directing plaintiff to complete the project or in the alternative for damages for breach of contract. Plaintiff's answer to the counterclaim consisted of denials; no affirmative defenses were asserted.

Upon trial to the court, it was ruled plaintiff had failed to sustain the allegations in its complaint and defendant had sustained the allegations of its counterclaim. The trial court found defendant was entitled to a judgment of $51,868.00 plus $2,500 attorneys fees and costs for plaintiff's breach of contract; this sum was to be set off against $67,496.58 due to plaintiff under the contract.

After the court rendered judgment, plaintiff filed a motion to amend the findings of fact and conclusions of law; this motion was denied. Subsequently, plaintiff filed an amended complaint, pursuant to Rule 15(b), U.R.C.P., on the ground it was amending its pleadings to conform with the issues that were tried by the express or implied consent of the parties.

At the trial, the evidence established the water table chart furnished to plaintiff was accurate. The evidence indicated there was a fluctuating water table in the project area and that neither plaintiff nor defendant were aware of such fact.

The primary factual issue tried in the proceedings was the cause of the failure of the pavement to meet contract specifications. The evidence was sharply conflicting on this issue, and the trial court resolved them in defendant's favor.

The trial court found plaintiff failed to fulfill all the terms of the contract, in that the paving and compaction specifications were not met, and plaintiff failed to complete the painting, installation of fencing and tie downs pursuant to contract requirements. Plaintiff generally exhibited poor workmanship on the project. The trial court found the water table chart was not false or misleading, and was not part of the

contract documents. The airport project could have been completed according to the plans and specifications even though the water table was different than plaintiff expected. Plaintiff had no valid claim for extra costs, and the conditions encountered by plaintiff, although not perfect could have been reasonably anticipated. Plaintiff failed to show by evidence or testimony any of its alleged damages. The trial court further found plaintiff had never alleged error, mistake, misunderstanding, mutual mistake, impossibility or frustration as a basis for its contractual deficiencies, and even had plaintiff alleged any of these theories; there was no evidence presented at trial which would support such claims. The court further found that for defendant to remedy the deficiencies and poor workmanship of plaintiff, it would require the application of a ¾'s popcorn overlay on the airport surfaces at the cost of $49,268.00 and an additional $500.00 for preparatory sweeping. The reasonable cost of completing the painting and installing the fencing and tie downs required by the contract was found to be $2,100.

■ At this juncture it is appropriate to review the law, since plaintiff's main point on appeal is that it should prevail, because the water table chart, although not false, was misleading.

A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than represented. [Citations] This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness. The fact that a breach is fraudulent does not make the rule inapplicable. . . . [1]

On the other hand, one who has contracted to perform a particular job for a stated price, if performance is possible, will not be excused from performance or entitled to extra compensation on account of encountering difficulties which have not been provided against in the contract.[2]

The case of *E. H. Morrill Company v. State*[3] provides an example of the circumstances under which the state may be held liable for extra compensation under a public works contract under a theory of breach of an implied warranty or fraudulent misrepresentation. The contractor claimed his damages resulted from the state's misrepresentation or warranty as to the subsurface conditions that would be encountered in excavating the contract site.

The court stated that Section 1A–12 of the plans and specifications did not purport merely to present the results of the state's own tests and investigations but flatly asserted the bidders could expect to confront only specified site conditions. The court deemed such a provision clearly as a positive and material representation as to a condition presumably within the knowledge of the government. The court further emphasized there was nothing in Section 1A–12 of the Special Conditions, wherein there was made a positive assertion of fact, to draw the attention of the bidder to the purported disclaimer of Section 4 of the General Conditions.

The companion case to *E. H. Morrill Company* was *Wunderlich v. State of California*,[4] wherein the plaintiff contractor claimed a breach of warranty with respect

1. *Souza & McCue Construction Co. v. Superior Court of San Benito County*, 57 Cal.2d 508, 20 Cal.Rptr. 634, 370 P.2d 338, 339–340 (1962); also see 76 A.L.R. 268, 269, 85 A.L.R.2d 211, 212–213.

2. *Wunderlich v. State of California*, 65 Cal.2d 777, 56 Cal.Rptr. 473, 423 P.2d 545, 548 (1967); 76 A.L.R. 268, 85 A.L.R.2d 212.

3. 65 Cal.2d 787, 56 Cal.Rptr. 479, 423 P.2d 551 (1967).

4. 65 Cal.2d 777, 56 Cal.Rptr. 473, 423 P.2d 545 (1967).

to a source of materials available for construction of a highway. Prior to bidding, the state conducted a "job showing" at the project site. A representative of the state brought with him copies of the plans and specifications and test reports of mineral sources convenient to the project site. One of the documents was an interdepartmental memorandum dealing with the condition of these sources. Plaintiff's estimator utilized this memorandum; stated therein was the following:

> Submitted herewith is information concerning possible local material sources for the project. . . . This information has been developed during the investigation for borrow sites and possibly would be of value to the prospective bidders for this project. . . .

The memorandum reproduced the results of the tests taken of the Wilder pits, which plaintiff ultimately determined to utilize. Plaintiff found that the necessary materials could not be produced at the bid price from the Wilder pit. Plaintiff completed the project, first by bringing in new equipment for the Wilder site and ultimately by using materials from more distant sources.

The court stated there was no factual dispute as to the nature of the reports and representations but rather the dispute concerned the legal consequences of the representations. Plaintiff contended the information concerning the Wilder pit constituted a representation and warranty that sufficient suitable material would be available at the pit to complete the project and that, in fact, the state misrepresented conditions. The state asserted that all it represented was that tests had been taken, the tests were accurately reported, and the Wilder pit was a potential source of materials for the project.

The court observed the crucial question was one of justifiable reliance, for if statements honestly made may be suggestive only, expenses caused by unforeseen conditions will be placed on the contractor, especially if the contract so stipulates.

The court commented there was no positive representation as to the material content of the Wilder pit. The state did little more than report the results of its testing. The court stated:

> What plaintiffs argue, in effect, is that by presentation of its borings and tests, though accurately reported, the state assumes liability for the contractor's erroneous assumption in bidding that the pit would average a fixed percentage of gravel. This ignores the fact that the state 'was simply under obligation to make no false statement to plaintiff, and the claimed inaccuracy and falsity of the soundings made . . . is the sole basis for plaintiff's claim.' [Citation omitted.] [5]

The court concluded:

> . . . When there is no misrepresentation of factual matters within the state's knowledge or withholding of material information, and when both parties have equal access to information as to the nature of the tests which resulted in the state's findings, the contractor may not claim in the face of a pertinent disclaimer that the presentation of the information, or a reasonable summary thereof, amounts to a warranty of the conditions that will actually be found.[6]

■ The *Wunderlich* case is applicable to the instant action. The information concerning the water table was not included in the plans and specifications but was provided at plaintiff's request. The information concerning the tests was accurate. There was no representation that the water table would be the same at the time plaintiff commenced construction. It was pure assumption on the part of plaintiff the water table would remain constant. Furthermore, the contract contained a specific disclaimer as to any information regarding soil or material borings or tests. "The information is not guaranteed and no claims for extra work or damages will be considered if

---

**5.** At p. 477 of 56 Cal.Rptr., at p. 549 of 423 P.2d.

**6.** At p. 478 of 56 Cal.Rptr., at p. 550 of 423 P.2d.

it is found during construction that the actual soil or material conditions vary from those indicated by the borings."

Defendant had no knowledge of any impediments to performance and had made no misrepresentations as to conditions. To hold defendant liable under such circumstances would cast upon it responsibility for all conditions a contractor might encounter and make the cost of the project an unknown quantity.[7]

Another aspect of significance is that plaintiff, neither in its complaint nor amended complaint, alleged it relied on the information as a basis in making its bid, that it acted reasonably in relying on the information, and as a result it submitted a bid which was lower than it would have otherwise made. Plaintiff's entire claim reduced to its basic elements is that defendant should bear responsibility for any condition which plaintiff did not subjectively anticipate and that defendant had a duty to assure that the conditions at the project site reached all of plaintiff's optimistic expectations. This theory is contrary to all the aforecited law.[8]

Many of the points raised in plaintiff's brief are contingent on the ruling of the trial court denying plaintiff's motion to file an amended complaint one month after the judgment had been rendered. Plaintiff contends the amended complaint merely amended the pleadings to conform to the issues tried by the express or implied consent of the parties, as provided in Rule 15(b), U.R.C.P.

■ Under the first part of Rule 15(b), U.R.C.P., if the issues are tried with the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. The parties may, by express consent, or by introduction of evidence without objection, amend the pleadings at will.

The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried. There must, of course, be either express or implied consent of the parties for the trial of issues not raised in the pleadings. Implied consent may be found where one party raises an issue material to the other party's case, or where evidence is introduced without objection.

Significantly, the first part of Rule 15(b) is not permissive in terms, for its provides that issues tried by express or implied consent *shall* be treated as if raised in the pleadings. Even failure to amend does not affect the result of the trial of these issues.[9]

■ The record indicates plaintiff made no motion to amend its pleadings during the course of the trial and that defendant gave no express consent to try the issues. When plaintiff attempted to introduce issues concerning the alleged duty of the project engineer to direct plaintiff to use other equipment or use other techniques, and the design of the airport, defendant asserted an objection, which was sustained on the ground the issue was whether false information was given as to the water table.

---

7. At p. 478 of 56 Cal.Rptr., Id. at p. 550 of 423 P.2d.

8. Plaintiff cites a number of cases wherein the contract contained a general provision providing for an adjustment between the contractor and government because of increases or decreases in costs resulting from the encountering of changed conditions, viz., conditions differing materially from those stated in the contract or unknown conditions of an unusual nature, not ordinarily encountered in the kind of work provided for in the contract. The purpose of these changed condition clauses is to make it possible for the government to obtain

lower bids, viz., the contractor is not required to include in his bid a sum to insure him against loss resulting from unforeseen conditions, since the government by these clauses grants him an equitable adjustment if the unforeseen occurs. See 85 A.L.R.2d 211, 215–216. Plaintiff does not claim its contract contained a changed condition clause; and, therefore, it cannot rely on those decisions granting relief under such provisions.

9. *General Insurance Company of America v. Carnicero Dynasty Corporation*, Utah, 545 P.2d 502, 506 (1976).

The amended complaint attempted to modify the entire course of the proceedings. The plaintiff alleged therein that to complete the project it was determined that an additional popcorn overlay of asphalt should be placed on the runway, and the parties could not agree who should pay for this work. In Count I, plaintiff alleged acts of negligence on the part of defendant in supplying information concerning the water table. In Count II, there was an allegation defendant failed to design adequately the airport. In Count III, there was an allegation that defendant failed to drain the project prior to construction in the spring. In Count IV, there was an allegation defendant failed to direct plaintiff to use other equipment or to use other techniques if plaintiff were proceeding in an improper manner. In Count V, plaintiff alleged it was frustrated in completing the contract as bid because of changed conditions. In Count VI there was an allegation that neither party could have anticipated the changed conditions that plaintiff encountered at the time of construction, and this mutual mistake necessitated extra work and expense. Plaintiff prayed for relief on the basis of quantum meruit or for damages in the amount of $121,097.31. Plaintiff further sought a decree directing defendant to pay all expenses incident to the work of installing the popcorn overlay.

Under the pleadings before the trial court, plaintiff sought compensation for extra work under the claim the contract had been completed. The issues concerning the popcorn overlay were a matter of defense to defendant's counterclaim, wherein plaintiff's breach of contract was alleged. Plaintiff does not explain how the issues of defendant's counterclaim were incorporated into plaintiff's complaint and were tried as an integral part of plaintiff's claim. It should be further observed the trial court found, and plaintiff did not seek modifica-

tion thereof, that plaintiff never alleged mistake or frustration as a basis for its contractual deficiencies, and there was no evidence presented which would support such a claim.

██ The trial court did not err in its denial of plaintiff's motion to file an amended complaint. Nor did it err in denying plaintiff's motion to amend the findings of fact and conclusions of law, since the matters proposed were an attempt to interpret the evidence according to plaintiff's theory of the case [10] and to interject issues which were not tried.

ELLETT, C. J., CROCKETT and WILKINS, JJ., and F. HENRI HENRIOD, Retired J., concur.

HALL, J., having disqualified himself does not participate herein.

F. HENRI HENRIOD, Retired J., sat.

---

**10.** E.g., in two of plaintiff's proposed findings, the purpose of the popcorn layer was recited as necessary to stabilize the lack of compaction in the surface of the runway. This interpretation follows plaintiff's theory that the lack of compaction was caused by the high water table.

The unrefuted evidence in the record indicates the popcorn layer was to prevent premature oxidation of the checked and cracked surfaces and to correct the smoothness problems; it was represented to add very little strength to the existing surfaces.