**THORN CONSTRUCTION COMPANY, INC., a Utah Corporation, Plaintiff and Respondent,**

v.

**UTAH DEPARTMENT OF TRANSPORTATION, Defendant and Appellant.**

No. 15647.

Supreme Court of Utah.

July 16, 1979.

10.   104 Utah 333, 140 P.2d 321 (1943).

Robert B. Hansen, Atty. Gen., Leland D. Ford, Asst. Atty. Gen., Salt Lake City, for defendant and appellant.

Steven H. Stewart, Salt Lake City, for plaintiff and respondent.

MAUGHAN, Justice:

Defendant appeals from a judgment in favor of plaintiff in the amount of $24,500, representing additional compensation for work performed by plaintiff under a road construction contract. We affirm. No costs awarded.

On March 27, 1973, plaintiff and defendant contracted for the construction of an access road at Rockport State Park, near Wanship, Utah. The contract was awarded to plaintiff according to the standard process of competitive bidding, plaintiff having bid the lowest figure. Incorporated into the contract were the State of Utah Standard Specifications (herein Standard Specification), which set forth certain requirements and minimum standards for material used in such projects. Prior to submitting its bid, several representatives of plaintiff

and one Virgil Mitchell, an engineer's aide for defendant, toured the work site to inspect conditions and potential sources of borrow (fill material). As part of this tour, the party stopped at the "Utelite property", which was close to the construction site. Mr. Mitchell stated, according to testimony believed by the district court, the Utelite pit was available and could be used for borrow. Several other sources of borrow material were discussed, although apparently not visited; plaintiff later computed his unit cost for loading, hauling and unloading the borrow material based upon the Utelite property. After defendant conducted certain tests on the material, it was discovered it did not meet the minimum standards, and defendant informed plaintiff that the Utelite pit could not be used. Plaintiff then obtained suitable borrow material from the "Crandall pit," which was 1.7 miles farther from the site than was the Utelite pit.

Plaintiff asserted at trial that due to the greater distance from the construction site, and certain conditions at the Crandall pit making loading and hauling more difficult, it incurred extra expenses over its bid price of $1.20 per yard of borrow. Defendant argues before us, as it did at trial, that Mr. Mitchell did not misrepresent the condition of the borrow at the Utelite pit, and that plaintiff was not entitled to rely on his statements.

Plaintiff's second claim before the district court was for additional compensation for extra work performed at the request of defendant involving the widening of a certain turning area in the road. Defendant countered that plaintiff was not entitled to extra compensation because it had not submitted a written request, as required by the Standard Specifications.

Plaintiff also asserted at trial it was entitled to recalculate its total costs with respect to the amount of borrow actually used on the project and renegotiate a supplemental agreement on a "force account," or total cost basis. Defendant disagrees, and points out that the actual amount of borrow used was only 45 percent of the original estimate. Defendant contends plaintiff is therefore entitled only to an adjustment for its fixed costs according to § 104.02 of the Standard Specifications as it relates to adjustments in the contract because of major underruns.

Plaintiff presented evidence indicating the extra expenses incurred because of the above problems totalled $38,642.83; the district court sitting as the trier of fact, awarded plaintiff $24,500, without indicating what amounts pertained to plaintiff's respective claims. Defendant asserts before us the district court erred in its rulings and there must be a new trial. We address the issues in the order presented above.

In its conclusions of law, the district court held that plaintiff was entitled to rely on the representations of Mr. Mitchell, as to the borrow from the Utelite pit and plaintiff could therefore recover for extra expenses associated with transporting borrow from the Crandall pit. We agree. The evidence presented on what Mr. Mitchell represented as to the borrow at the Utelite pit conflicted, to some degree; the testimony most favorable to plaintiff's point of view came from Jerry Thorn; president of plaintiff, who stated: "It was represented to us, this material was available and could be used for borrow on this project."

The district judge, as the trier of fact in this case, accepted this statement as true and held Mr. Mitchell had, on behalf of defendant, made a positive representation that the borrow was suitable for use on the project, on which plaintiff was entitled to rely. We believe plaintiff could have justifiably relied upon the above statement that the material "could be used for borrow on this project," especially in view of the fact that Mr. Mitchell showed plaintiff's representatives the location of the pit. Plaintiff's officers were entitled to believe as they did, viz., the state had determined the Utelite pit was closest to the construction site and contained material suitable for use as borrow in the project. The close proximity of the pit to the construction site, plus statements of Mr. Mitchell made it inconceivable plaintiff would have chosen any other site for borrow. We reach this result

notwithstanding the existence of the following provision in the Standard Specifications, Section 102.05:

> . . . The bidder is required to examine carefully the site of the proposed work, the proposal, plans, specifications, supplemental specifications, special provisions, and contract forms before submitting a proposal. The submission of a bid shall be considered prima facie evidence that the bidder has made such examination and is satisfied as to the conditions to be encountered in performing the work and as to the requirements of the plans, specifications, supplemental specifications, special provisions, and contract.

■ It is a reasonable principle of law that:

> A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than represented. [Citations] [1]

■ A case illustrating this principle is *E. H. Morrill Company v. State*, 65 Cal.2d 787, 56 Cal.Rptr. 479, 423 P.2d 551 (1967), in which the contractor claimed damages arising from a misrepresentation in the specifications as to the amount and size of subsurface boulders at the construction site. The court stated the specifications in question did not merely present the results of the state's own tests, but flatly asserted the bidders could expect to confront boulders of a certain range of size. It was held the contractor was entitled to rely upon the representations made, notwithstanding the existence of general language in another section of the contracts requiring the contractor to "satisfy himself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered." In *Hollerbach v. United*

*States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914), the U.S. Supreme Court faced a similar case. The contractor, in repairing a dam pursuant to government specifications, was misled by incorrect specifications as to certain material conditions to be encountered. The contract contained general provisions requiring the contractor to inspect the site and assure himself of all conditions necessary to make a proper bid. The court held these general admonitions did not overcome the positive representations as to the conditions in question, stating:

> We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specifications furnished by the government as a basis of the contract left in no doubt. . . . In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to reply without an investigation to prove its falsity. [2]

Likewise, the general warning in the specifications quoted above is not enough to overcome the specific representation made by Mr. Mitchell that the material at the Utelite pit could be used in the project particularly in view of the fact the representation was made while plaintiff's representatives were making the required inspection of the area.

A companion case to E. H. Morrill Company was *Wunderlich v. State of California*, 65 Cal.2d 777, 56 Cal.Rptr. 473, 423 P.2d 545 (1967). *Wunderlich* reached the opposite result of *E. H. Morrill*; in *Wunderlich* the contractor utilized for its bid a memorandum from the state on test results pertaining to materials from a certain pit. The memorandum stated the tests indicated the material tested was suitable for gravel and aggregate to be used in the project. The materials later proved to be unsatisfactory, and the contractor sued to obtain reimbursement for extra expenses incurred by

**1.** *Souza & McCue Construction Co. v. Superior Court of San Benito County*, 57 Cal.2d 508, 20 Cal.Rptr. 634, 370 P.2d 338, 339 (1962).

**2.** *Hollerbach v. United States*, supra, 233 U.S. at 172, 34 S.Ct. at 556.

obtaining the material from more distant sites. The California Supreme Court held the contractor was not justified in relying upon the memorandum alone in its determination to use materials in its bid. The court noted:

There is no positive representation as to the material content of the Wilder pit. The state did little more than report the results of its testing.

\* \* \* \* \* \*

What plaintiffs argue, in effect, is that by the presentation of its borings and tests, though accurately reported, the state assumes liability for the contractor's erroneous assumption in bidding that the pit would average approximately a fixed percentage of gravel. This ignores the fact that the state 'was simply under obligation to make no false statement to plaintiff . . .' [Citation omitted.][3]

The court also took note of an explicit disclaimer contained in the specifications. The disclaimer was referred to in the same paragraph as the test results; it stated the contractor must satisfy himself as to quantity of acceptable material available at the source of the tested area. Considering the fact the test results were not inaccurate, and the existence of the specific disclaimer, the court concluded there was no justified reliance by the contractor.

In addition to its reliance on *Wunderlich*, defendant finds support in a recent case decided by this Court. In *L. A. Young Sons Construction Co. v. County of Tooele,* Utah, 575 P.2d 1034 (1978), we analyzed both the *E. H. Morrill* and *Wunderlich* cases, and determined that *Wunderlich* applied to the facts presented us. In the *Young* case, the contractor was the successful bidder to construct the Tooele Valley Airport. Prior to submitting his bid, he obtained from the county data indicating the water table of the project area, and he relied on this information in submitting his bid. The data was accurate, but the water table fluctuated from time to time which neither party realized. We held the county was not liable for

extra expenses caused by the higher water table, where there was no evidence indicating the county misrepresented the conditions and the test information provided to the contractor was accurate. We noted also the existence of a specific disclaimer as to any information provided regarding soil or material borings or tests.

The *Young* case is distinguishable from the case at hand. Here, according to the facts as the district court found them to be, the representative of the department stated the material at the Utelite pit could be used in the project. He did not simply report the findings of any tests made, but made a positive representation that was untrue, on which plaintiff's representatives relied in computing their bid. Their reliance was, in our opinion, justified, according to the authorities discussed above.

■ Defendant next contends that plaintiff is not entitled to recover any sums for extra expenses incurred at defendant's request in widening a turning area in the road. It was undisputed the work was done at the oral request of the project engineer, in the midst of the construction, and the work was not contemplated in plaintiff's original bid. Defendant does not dispute the project engineer agreed to pay plaintiff for the extra expenses, although no amounts were discussed. Nevertheless, defendant asserts, plaintiff may not recover because of the terms of § 105.17 of the Standard Specifications:

If, in any case, where the contractor deems that additional compensation is due him for work or material not clearly covered in the contract or not ordered by the engineer as extra work as defined herein, the contractor shall notify the engineer in writing of his intention to make a claim for such additional compensation before he begins the work on which he bases the claim.

Defendant asserts that because plaintiff never submitted a written notification of its intent to perform the extra work as ordered, plaintiff has waived its right to ob-

---

**3.** *Wunderlich v. State of California,* supra, 56 Cal.Rptr. 477, 423 P.2d 549.

tain additional compensation. The terms quoted above, however, do not contemplate the necessity of a written order in a case such as this, where the project engineer, not the contractor, causes extra work to be performed. Here the extra work was specifically ordered by the engineer, and in such a case, the defendant obviously is on notice that additional compensation will be required. The district court correctly allowed compensation for the costs of such extra work.

■ We turn to defendant's next assertion which is: the district court erred in allowing plaintiff to present its damages according to a "force account," or total cost theory. The project actually required 15,-305 cubic yards of borrow, whereas the original estimate contemplated the use of 28,100 cubic yards. Because of the large underrun, defendant takes the position that plaintiff is therefore entitled to an adjustment for his fixed costs, according to § 104.02 of the Standard Specifications, but is not entitled to alter the unit prices originally used in its bid.

Section 104.02 provides:

. . . The contractor agrees to accept the work as altered . . . provided, however, that if demand is made in writing by either party to the contract, a supplemental agreement will be necessary before any alteration is made which involves any one of the following:

. . . (3) An increase or decrease of more than 25% in the quantity of any major contract item . . . .

. . . The adjustment in compensation provided for under conditions (2) and (3) above, . . . In the event of a decrease, any adjustments in payment shall apply to the quantity or quantities of work actually performed.

In the case of decreased quantities of work, no allowance shall be made in the supplemental agreement for anticipated profits. . . .

The above provisions contemplate the creation of supplemental agreements before the alteration is made. Here, however, the fact of the underrun was not realized by either party until the final quantities were calculated at the conclusion of the project. Defendant contends that according to the above section, plaintiff is only entitled to an adjustment for its fixed costs as calculated in the original bid, because the underrun was admittedly greater than 25 percent. The district court allowed plaintiff to present figures showing its total costs on the theory that if plaintiff proved its case, its unit costs would be increased because of the representations by defendant as to the Utelite pit.

In its conclusions of law, the court held plaintiff was entitled to compensation for extra expenses incurred in obtaining and transporting borrow from the Crandall pit, and in widening the turning area where the access road met the existing roadway. No mention is made of any compensation because of the underrun alone, and it is unclear whether any amount was awarded on that basis. However, plaintiff presented sufficient evidence to support the award based on its expenses associated with obtaining borrow from the Crandall pit, and with widening the turning area; and on that basis, we sustain the award of the court.

In view of our agreement with the district court as to plaintiff's claims, it would unfairly penalize plaintiff to require that it be compensated according to the original bid figures. Because the record reveals the extra costs were necessitated by the representations and requests of defendant as outlined above, plaintiff was properly allowed, under these factual circumstances, to calculate its damages under the "force account."

WILKINS and HALL, JJ., concur.

STEWART, Justice: (dissenting in part and concurring in part).

I dissent from the majority opinion in this case on the ground that there is no rule of law which supports plaintiff's recovery of damages for additional expenses incurred in obtaining suitable borrow material to meet the specifications of the road construction contract.

The majority treats this case as if it were simply an application of the principle of law relied upon in *E. H. Morrill Co. v. State*, 65 Cal.2d 787, 56 Cal.Rptr. 479, 423 P.2d 551 (1967), but it is not. That case is an application of the general proposition stated in *Souza & McCue Construction Co. v. Superior Court of San Benito*, 57 Cal.2d 508, 20 Cal.Rptr. 634, 635–36, 370 P.2d 338, 339–340 (1962):

> A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented. [Citations.] *This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness.* The fact that a breach is fraudulent does not make the rule inapplicable. [Emphasis added.]

It is perfectly reasonable to hold that *plans and specifications* which make representations of fact as to conditions upon which a contractor bases a bid should be held to warrant the correctness of those representations. But it is altogether another proposition to hold that low level state employees, without authorization from any superior, without any particular training, and without specialized knowledge, can make a statement which the state must warrant.

Every case cited in the majority opinion to support the recovery in this case for the increased expenses resulting from having to obtain other borrow material is based upon factual representations contained *in written plans and specifications.* See *Hollerbach v. United States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *E. H. Morrill Co. v. State*, supra; [65 Cal.2d 787, 56 Cal.Rptr. 479, 423 P.2d 551 (1967)]; *Wunderlich v. State of California*, 65 Cal.2d 777, 56 Cal.Rptr. 473, 423 P.2d 545 (1967).

The only Utah case cited by the majority to support recovery in this case is *L. A. Young Sons Construction Co. v. County of Tooele, Utah,* 575 P.2d 1034 (1978). However, *L. A. Young* does not support the result in this case at all. That case expressly relied upon the general proposition above referred to, i. e., that plans and specifications supplied by a public authority may be deemed to warrant the correctness of a factual representation contained therein. In fact, *L. A. Young* supports the exact contrary conclusions, in my view. The issue in that case was whether the construction company could avoid a liability on a counterclaim by the County of Tooele for work done in connection with the construction of an airport because of its reliance upon a water table chart supplied by the county, which, although not false, was misleading to the extent that it did not indicate that the water table in fact fluctuated. In *L. A. Young,* the Court relying on *Wunderlich* stated (575 P.2d at 1038):

> The *Wunderlich* case is applicable to the instant action. The information containing the water table was not included in the plans and specifications but was provided at plaintiff's request. The information concerning the tests was accurate. There was no representation that the water table would be the same at the time plaintiff commenced construction. It was pure assumption on the part of the plaintiff the water table would remain constant. Furthermore, the contract contained a specific disclaimer as to any information regarding soil or material borings or tests. "The information is not guaranteed and no claims for extra work or damages will be considered if it is found during construction that the actual soil or material conditions vary from those indicated by the borings."

> Defendant had no knowledge of any impediments to performance and had made no misrepresentations as to conditions. To hold defendant liable under such circumstances would cast upon it responsibility for all conditions a contractor might encounter and make the cost of the project an unknown quantity.

Another aspect of significance is that plaintiff, neither in his complaint nor amended complaint, alleged it relied on the information as a basis in making its bid, that it acted reasonably in relying on the information, and as a result it submitted a bid which was lower than it would have otherwise made. *Plaintiff's entire claim reduced to its basic elements is that defendant should bear responsibility for any condition which plaintiff did not subjectively anticipate and that defendant had a duty to assure that the conditions at the project site reached all of plaintiff's optimistic expectations.* This theory is contrary to all the aforecited law. [Emphasis added.]

In the instant case the record shows that the state employee who suggested Utelite as a potential source of borrow material had no training with the State Department of Transportation or its predecessor agency in the area of materials or the testing of materials. He did not claim to know whether any material from the Utelite pit had ever been used in highway construction. Nor did he claim to know whether that material had been tested for such use. He made no positive representations to the plaintiff beyond his unsupported statement that material from the Utelite pit was available and could be used for borrow. The plaintiff then relied on this statement without further substantiation and calculated the bid item of borrow on the basis of taking the necessary material from the Utelite pit.

A reasonably prudent contractor would not have relied upon the statement of the state employee. In the first place, § 102.05 of the State's Standard Specifications provides that:

The submission of a bid shall be considered prima facie evidence that the bidder has made such examination and is satisfied as to the conditions to be encountered in performing the work and as to the requirements of the plans, specifications, supplemental specifications, special provisions, and contract.

The plaintiff in this case was thus made responsible for assuring himself of the quality of the material which he was required to supply to fulfill the job.

In the second place, the state employee, Mr. Mitchell, merely stated that the Utelite pit was available and could be used for borrow; he did not state that it met the State's specifications. Thus, even if the law were that the erroneous verbal representations of a low level state employee were deemed to be warranted by the state, no such positive representation can be found in this case. The findings of fact by the trial court in this regard clearly support that conclusion. They are set out in the margin.[1]

Finally, if this Court intends to extend the rule of warranty as to representations in written plans and specifications to include verbal representations by low level state employees, it ought to do so explicitly and not sub silentio.

For the foregoing reasons, I dissent as to that portion of the majority opinion which permits recovery for the increased expenses associated with acquiring a new source for borrow material.

I concur with respect to the remainder of the majority opinion.

---

1. 4. Mr. Mitchell, accompanied by Thorn's representatives, drove to a potential source of borrow material known as the "Utelite" property. Mr. Mitchell stated to representatives of Thorn that material from the Utelite pit was available for use as borrow in connection with the highway construction project. Virgil Mitchell had no training or experience with the Utah Department of Transportation or its predecessor, Utah State Department of Highways, in the area of materials or testing of materials. Mr. Mitchell further did not know of any material from the Utelite pit ever having been used in highway construction. He likewise did not know of any tests of said material as to suitability for borrow, and further had never discussed the Utelite property with the State's Engineer, Ed Watson, as a possible borrow source prior to showing this source to Thorn Construction Company personnel.

5. Relying on the representations of Mr. Mitchell, Thorn entered its bid in connection with the Wanship highway construction project and calculated the bid item of borrow on the basis of Mr. Mitchell's representations that the material from the Utelite pit could be used as borrow on the construction project.

CROCKETT, C. J., concurs with the views expressed in the opinion of STEWART, J.